UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

BRENDA BROWN,

                Plaintiff,                Case No.: 11-cv-15548
                                               Honorable David M. Lawson
                v.                          Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 13]**

      Plaintiff Brenda Brown brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.      RECOMMENDATION**

      For the reasons set forth below, the court finds that the ALJ's conclusion that Brown is not disabled is supported by substantial evidence of record. Accordingly, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [13] be GRANTED, Brown's motion [10] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II. REPORT

### A. Procedural History

On October 27, 2008, Brown filed applications for DIB and SSI, alleging disability as of July 24, 2003.[1] (Tr. 109-117). The claims were denied initially on March 6, 2009. (Tr. 55-63). Thereafter, Brown filed a timely request for an administrative hearing, which was held on June 28, 2010, before ALJ Andrew Sloss. (Tr. 25-39). Brown, represented by attorney Jeffrey Atkin, testified, as did vocational expert ("VE") Mary Williams. (*Id.*). On November 1, 2010, the ALJ found Brown not disabled. (Tr. 10-24). On October 14, 2011, the Appeals Council denied review. (Tr. 1-4). Brown filed for judicial review of the final decision on December 19, 2011 [1].

### B. Background

#### 1. *Disability Reports*

In an October 27, 2008 disability report, Brown reported that the conditions limiting her ability to work are a herniated disc at L4/L5 in her spine and "depression/anxiety." (Tr. 134). Brown reported that her conditions prevent her from "stand[ing] or sit[ting] long/can't twist turn or bend/constant loss of balance, feet are constantly numb." (*Id.*). Brown reported being seen for her conditions by her primary care physician, Dr. James Walker, who examines her and prescribes medication. (Tr. 136). Her reported medications include Darvocet, Flexeril, Motrin 800, Synthroid and Wellbutrin. (Tr. 137). She reported no side effects to these medications.

---

[1] In his decision, the ALJ noted that Brown had filed previous applications on August 24, 2004, which were denied initially on October 24, 2004, and finally denied by ALJ decision on May 18, 2007. (Tr. 13). Operating under the doctrine of *res judicata*, the ALJ determined that the applicable period to be reviewed in this case began on May 19, 2007, the day after the prior ALJ decision. (*Id.*). Brown does not challenge this finding and so it is accepted for purposes of this review.

(*Id.*).  She also reported having undergone no tests for her conditions.  (Tr. 137-38).

In a November 17, 2008 function report, Brown reported that her daily activities consist of getting up to go to the bathroom, brushing her teeth, stretching and exercising, taking a bath or shower, walking, sitting, lying down, fixing meals and checking the mail.  (Tr. 156).  She reported caring for a dog with her husband, and that she sometimes finds personal care difficult due to pain in her back and numbness in her feet.  (Tr. 157).  She reported difficulty sleeping for the same reasons.  (*Id.*).  Brown reported preparing quick and easy meals, taking approximately 10 minutes to do so, and also doing dishes, laundry, minimal dusting and sometimes attempting to mow the lawn.  (Tr. 158).  She goes outside daily to check the mail and can walk and drive alone.  (Tr. 159).  She reported shopping at the store for food twice a week with her husband for 30 minutes to an hour.  (*Id.*).  Brown reported that her hobbies had included bowling and horseshoes, but that she currently does nothing except watch television and talk on the phone once or twice a week.  (*Id.*).

Brown reported that her conditions affect her ability to lift, bend, stand, reach, walk, sit, climb stairs, as well as affect her memory, concentration and her ability to complete tasks.  (Tr. 161).  She reported that she is able to lift 10 pounds; that bending, reaching and stair climbing are painful; that her ability sit, stand and walk is limited; and that her ability to concentrate or complete tasks is affected by her pain, her medication side effects and a lack of sleep.  (*Id.*).  She is able to walk 5-15 minutes before needing to stop and rest.  (*Id.*).  She is able to follow instructions "okay I guess," and she gets along with authority figures "normal."  (Tr. 161-62).  She reported not handling stress well "lately" and that she was "overw[h]elmed with no working and being able to pay bills."  (Tr. 162).  She has been prescribed a brace for her back in 2004 that she wears when doing housework, shopping, or for support when her pain worsens.  (*Id.*).

In a May 11, 2009 disability appeals report, Brown reported that she had experienced a change in her condition consisting of "severe back pain with radiating pain and numbness; depression from pain" that occurred in 2000. (Tr. 167). She reported no new limitations relating to this change. (*Id.*). She reported being prescribed Sinemet for pain by her primary care physician, and that it produces no side effects. (Tr. 169). She also reported that her conditions do not affect her ability to care for her personal needs. (Tr. 170).

2.  *Plaintiff's Testimony*

At the hearing, Brown testified that she suffers from pain in her back and numbness in her legs. (Tr. 29). She has trouble balancing, and also has anxiety and depression. (*Id.*). She has trouble concentrating and is unable to sleep. (*Id.*). She has crying episodes and has "pain in different parts of my body; I didn't have that before." (*Id.*). She testified to receiving no current treatment for her back, although she had previously been through physical therapy. (Tr. 30). She also testified that she is taking Wellbutrin for her depression and anxiety, but that she receives no counseling. (*Id.*). Brown testified that some days she could cook her own meals, and perform housework like laundry and washing dishes. (Tr. 30-31). However, she spends most of her day lying down and watching "a little bit of television." (Tr. 31). Brown testified that she can sit for 15 minutes before her back cramps up and then she has to lie on the ground. (*Id.*). She can also walk 10 minutes, but that it is difficult for her to stand in one place. (*Id.*). She is able to lift a gallon of milk. (Tr. 32).

Brown testified that she is taking numerous medications and that her side effects include nausea, fatigue and difficulty remembering things. (*Id.*). She has difficulty sleeping at night and naps "a lot" during the day. (*Id.*). She also has no energy and her most comfortable position is lying on her back. (Tr. 32-33). She testified that she even has to alternate that position, as lying

4

down can also hurt her back. (*Id.*). She testified to alternating positions "every 15 minutes to a half an hour." (*Id.*). She noted difficulty with concentration and memory and occasional difficulty completing even one- to two-step tasks. (*Id.*). She testified to shopping with her husband but that she does not like being around others. (Tr. 34). She also testified to a loss of balance and difficulty climbing stairs, reaching over head and going to the bathroom. (Tr. 34-35).

        3.      *Medical Evidence*

            a.      *Treating Sources*

An MRI of Brown's lumbar spine taken on September 25, 2003, revealed a "small to moderate sized central disc protrusion abutting anterior thecal sac superimposed on diffuse disc bulge [ ] at L4-L5." (Tr. 254). An MRI of Brown's lumbar spine taken on April 9, 2004, revealed an "L4-L5 central disc protrusion similar in appearance and size to the prior examination of 9/24/2003." (Tr. 253). A EMG conducted on May 19, 2004, showed "a normal bilateral peroneal and tibial nerve conduction study. There is no evidence of a left or right lumbosacral radiculopathy." (Tr. 255-57).

On January 19, 2006, Brown was treated by her primary physician, Dr. Walker. (Tr. 179). She complained of back pain that had lasted a week. (*Id.*). While most of the notes from this appointment are illegible, it appears that, upon exam, Dr. Walker noted that Brown's pain was localized over the right and left sacroiliac ("SI") joint and there was mild tenderness on palpation of that joint. (*Id.*). However, he noted no other spinal tenderness. (*Id.*). He ordered a new MRI, noting that it was an old problem with similar symptoms. (*Id.*). He also prescribed Flexeril and Darvocet. (*Id.*). At an appointment on April 16, 2007, Brown complained of swollen glands, ear and back ache. (Tr. 178). She was diagnosed with an upper respiratory

infection and "work papers" were "filled out." (*Id.*). At an appointment on March 27, 2008, Brown complained of ear pain and lower back pain for "several years." (*Id.*). Brown reported that her symptoms had not improved for several years but were not worse. (*Id.*). Upon exam, Dr. Walker noted diffuse myalgia on palpation, no spinal tenderness, swelling or spasm, and no pain on a straight leg raising test. (*Id.*). He noted that Brown "complains of pain [without] significant finding on exam." (*Id.*). He recommended Brown see a "PMR" (what the court believes to be a physical medicine rehabilitation specialist) for what Dr. Walker suggested was a "better eval[uation]" and possible tx [treatment] to relieve sx [symptoms]", but Brown declined "despite knowing importance!" (*Id.*).

At a March 12, 2009 appointment, Brown complained of lower back pain, cold and purple feet, and burning down her legs. (Tr. 225). While some of the treatment notes are illegible, it appears Dr. Walker noted Brown reporting a brief (25 minute) episode of blue and purple feet that had not recurred. (*Id.*). She reported a decreased range of motion secondary to her pain. (*Id.*). He noted no other symptoms or loss of sensation. (*Id.*). He also mentioned that Brown had been skipping her thyroid medication. (*Id.*). He ordered an EMG of Brown's lower extremities to evaluate her parasthesia. (*Id.*). The EMG, conducted on March 23, 2009, was normal. (Tr. 232). At an April 13, 2009 appointment, Dr. Walker discussed the EMG results with Brown and informed her that she needed to see a PMR to evaluate her persistent leg pain. (Tr. 226).

Brown was evaluated by Dr. Steven Schultz, a physical medicine and rehabilitation specialist, on May 12, 2009. (Tr. 230-31). She reported that she had chronic back pain since a work injury in July 2003 and that her pain had been getting worse over the last few months. (Tr. 230). She reported previously having steroid injections "which were not particularly helpful."

6

(*Id.*). She described low back pain with radiculopathy down her legs, tingling in her feet, and a sense of restlessness at night. (*Id.*). She had not undergone any recent treatment. (*Id.*). She denied any weakness or incoordination of the extremities. (*Id.*). Upon examination, Dr. Schultz found Brown able "to move freely about the examination table." (Tr. 231). He noted tenderness in her lumbosacral spine and a restricted sacroiliac mobility bilaterally. (*Id.*). He also found tenderness over both greater trochanteric bursae, and tightness in her hamstrings, hip rotators and iliotibial bands. (*Id.*). A seated straight leg raising test was negative and her neurological examination was within normal limits. (*Id.*). His impression was "chronic low back pain, predominantly biomechanical in nature with underlying spondylosis, possible restless leg syndrome." (*Id.*). He recommended physical therapy, a trial of Neurontin, continued use of ibuprofen and Tylenol, activity "as tolerated," and a follow up. (*Id.*).

At an appointment with Dr. Walker on May 26, 2009, Brown sought medication refills and "paperwork." (Tr. 224). Dr. Walker's only notation is that he "discussed paperwork" and "filled out – see form." (*Id.*). While the nature of this "paperwork" is not clear, it is noted that there is no "form" from Dr. Walker in the present record. An MRI conducted on September 23, 2009, revealed "mild posterior disc bulging at L4-L5 and L5-S1 improved since January 2005." (Tr. 258).

          b.      *Consultative and Non-Examining Sources*

On February 2, 2009, Brown was examined by Dr. J.L. Tofaute for the State of Michigan. (Tr. 181-83). Brown reported that she injured her lower back while working in 2003. (Tr. 181). She experienced numbness in both heels and lower back pain since that time, and had difficulty maintaining her balance. (*Id.*). She reported currently being prescribed Synthroid, Ibuprofen 800, Flexeril, Darvocet and Wellbutrin, but being out of those medications at the time of the

7

exam. (Tr. 181-82). She was independent in feeding, bathing and dressing, and being able to drive. (Tr. 182). Brown reported being limited to 15-20 minutes of standing or sitting by her back cramps. (*Id.*). She reported shopping only with her husband present and that she was able to lift a gallon of milk, climb stairs, button clothes and tie shoes. (*Id.*).

Upon examination, Dr. Tofaute noted that Brown "walks and moves without apparent difficulty," was "using no handheld walking aids," and was "able to squat fully and arise under her own power." (*Id.*). She did not limp. (*Id.*). She was also able to tandem heel and toe walk and a straight leg raising test was negative. (*Id.*). She had an active range of motion in her thoracic-lumbar spine, although she had some problem with forward flexion and spinal extension. (*Id.*). She had no radicular complaints even with bending at the waist and neck flexion to the chest. (*Id.*). He noted no swelling of the ankles or feet and no foot deformity. (Tr. 183). He found "no significant complaints of localized tenderness to palpation in the muscles in the [lumbosacral] joint, either up above or below the sciatic notch." (*Id.*). Brown also had good strength and dexterity in both hands. (*Id.*). However, he found that "[t]apping over the posterior tibial nerve in the tarsal tunnels reproduced the paresthesias of which she had previously complaint," more on the right than the left. (*Id.*). In an accompanying range of motion assessment, Dr. Tofaute checked "yes" in the boxes regarding Brown's ability to perform numerous tasks, including squatting, getting on and off the examination table and climbing stairs. (Tr. 186). However, regarding her ability to sit, stand, bend, stoop, carry, push or pull, Dr. Tofaute noted only that Brown "says limited." (*Id.*).

On February 3, 2009, Brown was seen by Dr. Matthew Dickson for a mental evaluation for the State of Michigan. (Tr. 188-91). Brown reported constant back pain, numbness in her feet, anxiety, depression, inability to sleep and feeling overwhelmed. (Tr. 188). She said "I

8

haven't been able to find a job. I feel kind of helpless and it's very frustrating." (*Id.*). Brown reported taking no medications although she had previously been on Wellbutrin "for a while." (*Id.*). She was also not currently receiving any mental health services, and denied any psychiatric hospitalizations. (*Id.*). She reported generally getting along well with others and that she spends time with family and friends. (*Id.*). She denied any current interests. (*Id.*). She reported that her daily activities included housework, which took her "quite a while" to do. (Tr. 189). She also reported being independent in self-care, dealing with money and driving a car. (*Id.*). She lost her balance on her last shopping trip with her husband. (*Id.*).

Upon examination, Dr. Dickson found Brown to be in contact with reality, appropriately groomed and dressed, and not requiring assistance to keep appointments or find locations. (*Id.*). He found her speech unimpaired and her stream of mental activity spontaneous and organized, but that she was "somewhat passive-aggressive" in her responses to questions. (*Id.*). He found no significant evidence of hallucinations, delusions or persecutions or any suicidal or homicidal ideations or attempts. (*Id.*). Her affect was appropriate to her mood, which "appeared to be down during the exam today." (*Id.*). She was oriented to time, person and place, and could remember five numbers forward and four backward, and one of three objects after three minutes. (Tr. 189-90). She could name two past presidents, the current president, three large cities, two famous people and a current event. (Tr. 190). She performed calculations accurately and was almost fully accurate in serial backwards counting. (*Id.*). She correctly interpreted two proverbs, made accurate comparisons between objects and made adequate judgments of various situations. (*Id.*). Dr. Dickson stated that

> It was my impression that Brenda's mental abilities to understand, remember and carry out instructions are not impaired. Brenda's abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace are mildly impaired. Overall, based on

9

> today's exam and all the information available to me at this time, it is my impression that Brenda's psychological condition would mildly impair her ability to perform work related activities.

(*Id.*). He diagnosed her with an adjustment disorder with depressed mood, issued her a Global Assessment of Functioning score of 62, and gave her a guarded prognosis.

On March 5, 2009, Dr. Ashok Kaul completed a psychiatric review technique form for Brown covering the dates between October 7, 2008, and March 5, 2009. In it, he determined that Brown had a medical impairment, not severe, and a co-existing nonmental impairment. (Tr. 194). He found that she had an affective disorder, specifically an adjustment disorder (Tr. 194-97). He determined that this disorder placed mild restrictions on Brown's activities of daily living, her ability to maintain social functioning and her ability to maintain concentration, persistence and pace. (Tr. 204). He found no episodes of decompensation of extended duration. (*Id.*). He discussed her consultative mental examination findings and her reported activities of daily living and concluded that her

> description of her limitations [associated with] depression and anxiety are found to be credible. However, psychiatric exam . . . finds that the claimant retains the mental abilities to understand, remember and carry out instructions. The claimant's ability to respond to coworkers and supervision and to adapt to change and stress in the workplace would be mildly affected. Based on the psychiatric exam and other medical evidence, it is felt the claimant's condition would mildly impair her ability to perform work related activities.

(Tr. 206). Dr. Kaul gave "great weight" to Dr. Dickson's opinion "as it is consistent with the claimant's [activities of daily living.]" (*Id.*). Dr. Kaul also completed a psychiatric review technique form for Brown covering the dates between May 19, 2007 and October 6, 2008. (Tr. 208-21). In it, he concluded that the record contained insufficient evidence of a mental impairment to assess her disabled status during the referenced period. (*Id.*).

10

*4. Vocational Expert's Testimony*

VE Mary Williams testified that Brown's past work as a health and safety instructor was medium in exertion and skilled, her work as a fitness instructor was medium and semi-skilled, and her work as an activity aid was medium to heavy and semi-skilled. (Tr. 37). The ALJ asked the VE to consider a hypothetical person of Brown's age, education, and vocational background who was "able to perform sedentary work, as defined by the regulations, except that she can only occasionally climb, balance, stoop, crouch, kneel or crawl; and must avoid all exposure to hazards such as unprotected heights and moving industrial machinery" and who was "also limited to performance of simple tasks on a sustained basis." (*Id.*). He asked if such a person could perform any of Brown's past work. (*Id.*). The VE testified that a person with such restrictions could not perform Brown's past work. (*Id.*). The ALJ then asked whether there were other jobs in the national economy that such a person could perform. (*Id.*). The VE testified that such a person could perform jobs as an inspector (600 jobs in the regional economy), information clerk (2,000 jobs), or as a general office clerk (2,000 jobs). (Tr. 37-38). The ALJ then asked if all work would be precluded if the person were "unable to engage in sustained work activity on a regular and continuing basis for eight hours a day, five days a week for a forty hour workweek, or an equivalent work schedule". (Tr. 38). The VE testified that it would. (*Id.*). Brown's counsel then asked if competitive work would similarly be eliminated "if an individual was required to alternate between sitting, standing and laying down on a 15 minute basis." (*Id.*). The VE testified in the affirmative. (*Id.*).

**C.  Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant

part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**D.     The ALJ's Findings**

Following the five-step sequential analysis, the ALJ concluded that Brown was not disabled at any point since her alleged onset date. At Step One he found that she had not engaged in substantial gainful activity since her alleged onset date. (Tr. 15). At Step Two he determined that she had the following severe impairments: "degenerative disc disease and adjustment disorder." (*Id.*). At Step Three he found that her impairments, either alone or in combination, did not meet or medically equal a listed impairment. (Tr. 17). In doing so, he determined that Brown had mild restrictions in her activities of daily living and social functioning, moderate difficulties in maintaining concentration, persistence and pace, and no episodes of decompensation of extended duration. (*Id.*). The ALJ next assessed Brown's RFC, finding her capable of performing "sedentary work . . . except that the claimant can only occasionally climb, balance, stoop, crouch, kneel or crawl. She must avoid all exposure to hazards such as unprotected heights or industrial machinery. She retains the ability to perform simple tasks on a sustained basis." (Tr. 18). At Step Four the ALJ found that, based on Brown's age, education, vocational experience and RFC, she could not return to any of her past work. (Tr. 19). However, at Step Five, he determined that, based on the above criteria as well as VE testimony, there existed a significant number of other jobs in the national economy that Brown could still perform. (Tr. 20). Therefore, she was not disabled. (*Id.*).

**E.     Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact

13

unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is

14

supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F. Analysis

Brown argues that the ALJ erred in assessing her credibility, and that this failure to adequately credit her testimony led him to craft a hypothetical question that did not take into account all of her credible limitations. The court disagrees.

The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to her credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Thus an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). When a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of her pain are credible. *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529. The ALJ is to consider the claimant's daily activities, the "location, duration, frequency and intensity" of her pain, "precipitating and aggravating factors," "type, dosage, effectiveness and side effects of any medication," other treatments the claimant has received, any measures the claimant uses to alleviate her pain, and other factors concerning functional limitations and restrictions due to pain. 20 C.F.R. §

15

404.1529(c).

Brown argues that the ALJ erred by purportedly relying on a *lack* of objective medical evidence supporting Brown's complaints in order to discount her subjective reports and testimony, rather than considering all of the above factors. (Plf. Brf. at 14-15) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) and 20 C.F.R. §404.1529(c)(2) (Commissioner "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the affect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."). That argument fails, however, because in finding Brown's testimony less than credible, the ALJ specifically discussed a number of the above factors, including *both the existence* of objective medical evidence that belied Brown's complaints, *and the absence* of objective medical evidence that supported them.

Brown's own brief provides a nice starting point for the court's analysis as it documents the ALJ's myriad reasons for refusing to find her testimony controlling, including:

> her engaging in daily activities, ability function/maintain daily routine, lack of hospitalization for difficulties, no surgeries or aggressive treatment, lack of regular treatment, normal EMG/nerve conduction studies, lack of significant medication complaints, lack of physicians [sic] findings of limitations in daily activities, and lack of resting or napping necessity, among others.

(Plf. Brf. at 12; Tr. 19).[2] Indeed, in addition to each of the above reasons, the ALJ also noted that Brown did not "take prescribed medication on a regular basis" even though she obtained

---

[2] To be fair, Brown's point in citing this evidence is to suggest what she characterizes as an "odd" inconsistency – "that the ALJ would indicate that her 'medically determinable impairment could reasonably be expected to cause the alleged symptoms…' and then proceed to discount her testimony as to [their] intensity, persistence and limiting effects [] as non-credible." (Plf. Brf. at 12). However, the two are neither inconsistent, nor mutually exclusive. *See Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847, 852 (6th Cir. 1986) (quoting 42 U.S.C. §423(d)(5)(A)). It is not at all remarkable that the ALJ would find Brown suffered from a condition that *could* cause severe pain and limitations, but that the *actual* effects on her were less severe.

"relief from prescribed medications when taken." (Tr. 19). The ALJ noted that Brown "has been found to be alert, cooperative, pleasant and in no acute distress," that the "EMG/nerve conduction studies are essentially normal with no evidence of radiculopathy, neuropathy or myopathy," and that "[n]o physician reported that daily napping or resting is a necessary or helpful measure for treating her alleged impairments." (*Id.*). The ALJ also noted in his decision specific findings by the above-referenced physicians that support his credibility determination, including that: "[Brown] walked and moved without apparent difficulty. She was able to squat fully and arise under her own power…She had active range of motion of the thoracic and lumbar spine…no significant complaints of localized tenderness to palpation in the muscles of the LS joint…She had good facility with both hands…Her neurological examination included strength, sensation, and reflexes [] within normal limits." (Tr. 16-17).

In short, far from "blanket assertions that the claimant is not believable" (Plf. Brf. at 13), the ALJ provided numerous reasons for his credibility determination that are well supported by the record. *See also, supra* at 7-10. Accordingly, there is no basis to disturb his credibility determination.

Brown also argues that the ALJ improperly discounted Dr. Tofaute's notes of her subjective complaints of pain, specifically that her back cramps up after 15-20 minutes in one position. (Plf. Brf. at 13-14). She argues that if Dr. Tofaute had disbelieved her statements, or found them not to be credible, he would have so stated in his report. (*Id.*). However, as the Commissioner points out, it is not Dr. Tofaute's role to assess Brown's credibility. Rather, he must assess what her medical condition is and what her limitations are. Dr. Tofaute found that, despite Brown's subjective reports, the vast majority of her physical examination showed essentially normal results. (Tr. 181-83). The ALJ specifically referred to these findings in his

17

decision and noted that no examining doctor found any "basis to find limitations in her daily activities." (Tr. 16; 19).

Brown also argues that the ALJ ignored Dr. Kaul's assessment that Brown's "description of her limitations depression and anxiety are found to be credible." (Plf. Brf. at 14; Tr. 206). She argues that, since her testimony was consistent with these subjective reports, the ALJ erred in finding that testimony less than credible. (Plf. Brf. at 14). However, Dr. Kaul also found that, despite her credible statements, she remained only "mildly limited" in her ability to perform work. (Tr. 206). Brown ignores Dr. Kaul's conclusion that she was only minimally limited in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence and pace (Tr. 204), findings which were actually less restrictive than the RFC assessment the ALJ ultimately rendered, which found her *moderately* limited in her ability to maintain concentration, persistence and pace. (Tr. 17).

Finally, Brown argues that the ALJ left out of his analysis her report to Dr. Schultz that epidural injections in 2003 "were not particularly helpful," and that she had "physical therapy in the past," statements which she argues indicate a persistence of her symptoms. (Plf. Brf. at 14; Tr. 230). As the Commissioner points out, however, the ALJ had properly limited his review generally to the period from the date of the last decision, May 19, 2007. (Tr. 13). *See supra*, n. 1. He also incorporated by reference all discussion of Brown's prior medical record that was contained in the earlier decision. (Tr. 16). In that decision, the prior ALJ mentioned the records of these treatments, noting that they showed Brown had actually found a 2003 steroid injection to be helpful and that she was improving with physical therapy. (Tr. 47). Moreover, the ALJ specifically noted that Brown's condition, as seen on her most recent MRI, had improved from its state in 2005, which is contrary to her claims of persistence of symptoms. (Tr. 16).

For all of these reasons, the court finds that the ALJ properly assessed Brown's credibility, and that substantial evidence in the record supports his conclusion that she was not disabled.

### III. CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Brown's Motion for Summary Judgment **[10]** be **DENIED**, the Commissioner's Motion **[13]** be **GRANTED** and this case be **AFFIRMED**.

Dated: October 12, 2012  s/David R. Grand
Ann Arbor, Michigan  DAVID R. GRAND
 United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## **CERTIFICATE OF SERVICE**

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 12, 2012.

                                            s/Felicia M. Moses
                                            FELICIA M. MOSES
                                            Case Manager